IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRCT OF IOWA

MOLLY MASON,                )
                                 )
          Plaintiff,         )     CASE NO:  1:21-cv-00026-LRR-KEM
                                 )
v.                      )
                                 )     ANSWER
KIRKWOOD COMMUNITY COLLEGE,  )
                                 )
          Defendant.      )

Defendant Kirkwood Community College ("Kirkwood"), answers the allegations of Plaintiff's Complaint as follows:

THE PARTIES

1.      Mason is a resident of Port Jefferson, Suffolk County, New York.

**ANSWER:  Kirkwood admits the allegation of Paragraph 1.**

2.      Kirkwood is a public community college with its principal place of business in Cedar Rapids, Linn County, Iowa.

**ANSWER:  Kirkwood admits the allegation of Paragraph 2.**

JURISDICTION AND VENUE

3.      This is an action for a violation of the Visual Artists Rights Act of 1990, 17 U.S.C. Section 106A *et seq* under the United States Copyright Act ("VARA").

**ANSWER:   This statement does not call for a response as it sets forth only Plaintiff's characterization of her claims. To the extent a response is required, Kirkwood admits Plaintiff incorrectly asserts violation of federal law.**

4.      This action is based on violations of Mason's VARA rights, and this Court therefore has exclusive jurisdiction over these matters pursuant to 28 U.S.C. Section 1338(a).

**ANSWER:** **With respect to the allegations of Paragraph 4, Kirkwood does not respond to Plaintiff's characterization of her claims, denies that Kirkwood violated Mason's rights under VARA, and admits this Court's jurisdiction over this matter pursuant to 28 U.S.C. 1338(a).**

5.      Venue is proper in the Northern District of Iowa under 28 U.S.C. Section 1440(a) and 28 U.S.C. Section 1391(b), as Kirkwood maintains its principal place of business in this District and is therefore subject to personal jurisdiction in this District, the artwork at issue in this action is location in this District, and most if not all of the events, actions, and/or omissions that give rise to Mason's claims occurred in this District.

**ANSWER:** **Kirkwood admits that venue is proper in this Court pursuant to 28 U.S.C. § 1441(a) and 28 U.S.C. § 1391(b).**

FACTUAL ALLEGATIONS

6.      Mason was born in Cedar Rapids, Iowa, and is a sixth-generation Iowan with roots dating back to the 1820s. Mason earned her MFA, MA and BFA (Magna Cum Laude and Phi Beta Kappa) at the University of Iowa School of Art and Art History and has worked as a professional sculptor for 45 years. During her career as an artist, she has created over 25 major public commissions in architectural and natural settings, as well as over 200 sculptures that reside in more than 125 public, corporate, and private collections in the United States and several foreign countries. Mason has had 20 solo exhibits and her work has been selected in over 150 curated group exhibitions at museums, art centers, and galleries. Mason's Bibliography features over 200 reviews, articles in magazines and newspapers, and book inclusions on Mason's work spanning over 40 years, and featured in publications across the United States, Europe, Australia

and Japan. A select group of Mason's public artworks are pictured and described in copies of photographs attached hereto as Exhibits 1-12, and by this reference incorporated herein.

**ANSWER:** **The allegations of Paragraph 6 appear to contain the content of writings that, although not relevant, speak for themselves. To the extent an additional response is required, Kirkwood denies the allegations of Paragraph 6 for lack of information.**

7.     Long recognized for the aesthetic, conceptual, and technical quality of her work, Mason has created over 25 powerful, permanent public sculpture commissions across the United States, in Europe, and in Australia. Mason's work is expertly created by her use of many highly sophisticated techniques in durable and archival sculptural materials including stainless steel, cast and fabricated bronze, aluminum, kiln-formed glass, water components, stone, and polychromed surfaces, with works permanently installed both indoors and outdoors, integrated into both hardscapes and landscapes. Her sculptures have been created for universities, hospitals, arts centers, public parks, national sculpture parks, and other venues. Some of these public art commissions include the following: a sculpture for Germantown Performing Arts Center, outside of Memphis, TN; two large sculptures for Ogden Weber Technical College, Ogden, UT; sculpture for Meyer Amphitheater, West Palm Beach, FL; two outdoor sculptures and a water feature for the University of Central Florida, Orlando, FL; a gateway sculpture for the River Oaks Art Center, Alexandria, LA; a sculpture for Historic Constructions, New Orleans, LA; two works for Northwest Oro Valley Medical Center, Tucson, AZ; a sculpture for a public park in Brisbane, Australia; five exterior sculptures for the City of Albuquerque, NM; a sculpture for the Long Island Cultural Center, NY; two sculptures for Forma Viva International Sculpture Park, Kostanjevica, Slovenia; and a sculpture for the National Sculpture Park of Hungary, Villany,

Hungary. Nearly all of these were competitions open nationally or internationally to artists to submit their work, with Mason being selected from often more than 200 artists who had applied for each of these public art commissions.

**ANSWER:** **Kirkwood denies the allegations of Paragraph 7 for lack of information and because they are not relevant and are entirely self-promotional.**

8. Mason's work is also held in museum and corporate collections including Ogden Museum of Southern Art, New Orleans, LA; Michener Art Museum, Doylestown, PA; Gallerie Moderne, Vienna, VA; Royal Caribbean Cruise Lines, Norway; Texaco Corporation, New Orleans, LA; State St. Bank, Boston, MA; Nano Systems Inc., Philadelphia, PA; Tower, Perrin Corporation, New York City and Stamford, CT; Central Louisiana Light and Power Company, Alexandria, LA; Warwick Hotel, Houston, Texas; Bright Collection, New Orleans, LA; Acadiana Bank Headquarters, Baton Rouge, LA; Wyeth Laboratories, Collegeville, PA; the Spelce Collection, Austin, TX; Liberty Property Trust, Greenville, SC; Hill, Wallack, Attorneys, Princeton, NJ; and Elena Corporation, S. Nyack, NY. Mason's work is also included in over 100 additional private collections on four continents, many of which contain several of her works.

**ANSWER:** **Kirkwood denies the allegations of Paragraph 8 for lack of information and because they are not relevant and are entirely self-promotional.**

9. Mason has had solo exhibitions at museums including the Minneapolis Institute of the Arts, Minneapolis, MN; James A. Michener Museum of Art, Doylestown, PA; Triton Museum, Santa Clara, CA; and University of Minnesota Museum of Art, Morris, MN. Mason's work has been featured at professionally curated group exhibitions at museums and art centers including: Grounds for Sculpture, Johnson Atelier's Sculpture Museum, NJ; Governor's Island Invitational Art Festival, Governor's Island, NY; Adelphi University, Garden City, NY;

Rockland Center for the Arts, West Nyack, NY; Arts Center of the Capital Region, Troy, NY; Chesterwood Museum, Stockbridge, MA; New Orleans Museum of Art, LA; Pensacola Museum of Art, Pensacola, FL; Birmingham Museum of Art, AL; Albuquerque Museum of Art, NM; Contemporary Art Center, New Orleans, LA; University of Hawaii, Hilo; Tulane University Newcomb Gallery of Art, New Orleans, LA; University of New Mexico Museum of Art, Albuquerque; and University of Minnesota, Morris Art Museum. Nearly all of Mason's solo exhibitions and the great majority of the curated group exhibitions have been documented in catalogues and/or reviews.

**ANSWER:** **Kirkwood denies the allegations of Paragraph 9 for lack of information and because they are not relevant and are entirely self-promotional.**

10.     Mason has been a professor of graduate and undergraduate sculpture at five major universities, including SUNY Stony Brook, NY, Tulane University, LA, University of New Mexico, and Southern Illinois University at Edwardsville. Notably, she has taught courses on Public Art to graduate and undergraduate students beginning in 1980 at the University of New Mexico, Tulane University, and Stony Brook University, and, during her Fulbright Senior Research Professorship in Sculpture, when teaching at the Kyoto University of the Arts and Osaka University of the Arts in Japan, and at sculpture symposia in Hungary and Slovenia. She has been a Visiting Artist at her alma mater, the University of Iowa, and at the Cedar Rapids Ceramics Center, and also at University of California, Davis; Syracuse University; University of Wisconsin, Madison; Montclair State College, New Jersey; University of California, Chico; Oakland College, California; and The Ohio State University.

**ANSWER:**     **Kirkwood denies the allegations of Paragraph 10 for lack of information and because they are not relevant and are entirely self-promotional.**

11. Mason has been awarded over 45 fellowships, grants, and awards for her work, including a Fulbright Senior Research Professorship to Japan to study form and space in Japanese gardens; a Soros Foundation Fellowship for public sculptures in Hungary; a Millay Colony for the Arts Fellowship, NY; an American Association of University Women Award for her sculpture; two Ford Foundation Fellowships; two New York Foundation for the Arts (New York, NY) Special Opportunity Stipends; a Vermont Studio Center Fellowship, VT; a Women's Studio Workshop Artist's Fellowship, NY; a Minnesota State Arts Board Individual Artist Fellowship; one of three Louisiana State Arts Board Individual Artist Fellowships; and two Grahame Memorial Fellowships (at University of Iowa School of Art and Art History, awarded by the Studio Faculty to the outstanding graduate student in studio art, out of approximately 130 graduate students each year at that time in the MA and MFA program); as well as 19 competitive University faculty research fellowships. In 1995, Mason was voted into membership by the highly selective Sculptors Guild in New York City, a historical organization of sculptors founded in 1932.

**ANSWER:** **Kirkwood denies the allegations of Paragraph 11 for lack of information and because they are not relevant and are entirely self-promotional.**

PLANNING AND INSTALLTION OF SCULPTURE

12. In 2000, Mason was contacted by Mary Kayt Conrad, then the Dean of Humanities and Arts at Kirkwood ("Conrad"). She, and other members of Kirkwood's Art Acquisition Committee ("Committee") indicated that they had admired Mason's sculptures for years and were interested in having her create a work for Kirkwood.

**ANSWER:** **With respect to the allegations of Paragraph 12, Kirkwood admits communications occurred between representatives of Kirkwood and Plaintiff in 2000. All allegations not specifically admitted are denied for lack of information.**

13.     In August 2000, Mason met with the Committee to discuss sculptural concepts. Mason also gave a slide presentation on her major artworks to the Committee. After that meeting, Conrad reported to Mason that the Committee was impressed with her work, and wanted to have her create a sculpture for Kirkwood.

**ANSWER:** **With respect to the allegations of Paragraph 13, Kirkwood admits communications with Plaintiff occurred and, much later, discussions that ultimately resulted in an agreement in which Kirkwood hired Plaintiff for a sculpture (to be mounted in a utilitarian concrete basin and compatible with a water feature) contemplated for Kirkwood property. All allegations not specifically admitted are denied.**

14.     In 2006, Mason and the Committee began discussing terms for the creation of an artwork at Kirkwood, with the Committee expressing an interest in the artwork integrating a water feature. They agreed upon a budget of $80,000 for the artwork and Mason commenced with the design process in June of that year. The artwork was to be placed in the new continuing education building then under construction at Kirkwood ("Conference Center"). In a letter of June 30, 2006 from Conrad to Mason, Conrad confirms that Mason had begun creating "..a design for the sculpture in our new continuing education building." A copy of that letter is attached hereto as Exhibit 13, and by this reference incorporated herein. She also states that Kirkwood has already paid Mason "up front for design" for the artwork. *Id.* She mentions later in this letter that a budget has been "..set aside as part of the total construction of the building for

art in public buildings." *Id.* She further states "[l]et me tell you again how please [sic] I am that we will be getting your sculpture on campus at Kirkwood." *Id.* In an e-mail from Conrad to Mason dated May 19, 2006, she states that she would "really like to give you [Mason] free reign on the design of the piece," and that the Committee was "interested in water." A copy of that e-mail is attached hereto as Exhibit 14, and by this reference incorporated herein.

> **ANSWER:** **To the extent the allegations of Paragraph 14 appear to refer to the content of writings, such writings speak for themselves. Kirkwood admits that discussions regarding a sculpture (to be mounted in a utilitarian concrete basin and compatible with a water feature) for Kirkwood property began in 2006. To the extent a further response is required, any allegations not explicitly admitted are denied.**

15. The Committee expressed a strong desire for the artwork to incorporate a water feature, and Mason's final approved design addressed this desire to their enthusiastic and explicit satisfaction, combining sculptures and an integrated water feature collectively as one work of visual art. On February 28, 2007, Mason submitted a preliminary sculpture and water feature design plan with a model. The preliminary model would have been created in bronze, as that was the desire of the Committee at that time. However, Mason noted to the Committee that bronze is incompatible with water flowing through it, as water will destroy the lacquer on the bronze and change its color to a deep brown. In an e-mail dated April 9, 2007 from Dean Jennifer Bradley ("Bradley"), the Committee decided that its desire for an artwork incorporating a water feature was more important than its desire for the work to be in bronze, and the consensus of all parties was that the sculptural components of the artwork would be made in stainless steel. A copy of that e-mail is attached hereto as Exhibit 15, and by this reference incorporated herein. Bradley

states "[o]ne of the reasons we were excited about working with you was the prospect of a water feature, which is something we have admired in your other work. We would like the water feature to be an integral part of the sculpture, either emanating from it or flowing through it...It [the water feature]...can make some noise...enough noise to create a sense of privacy for those having conversations in this lobby area... We would like the pool to mirror or compliment the design of the sculpture, creating a tension that would generate a relationship with the sculpture... This might be accomplished by having some structured form that intermingles with more of an organic expression. We believe this has been represented in your past work with fabulous craft and skill...As time is of a premium, it would be helpful to first settle the issue of the pool...[because the] construction [schedule] demands it. If you [Mason] feel this is impossible, we can elect to forego the water feature entirely, but that would not be our preference." *Id.* Mason revised the design for stainless steel sculptures integrated with a water feature and submitted it to Kirkwood in May 2007. A copy of the Revised Public Sculpture/Water Feature Design Plan is attached hereto as Exhibit 16, and by this reference incorporated herein. In a May 23, 2007 letter from Bradley to Mason, Bradley stated "...how pleased the Art Acquisition Committee was with the proposed design. The new design incorporates all of our requests and pulls from all of our favorite aspects of your work." A copy of this letter is attached hereto as Exhibit 17, and by this reference incorporated herein.

**ANSWER: To the extent the allegations of Paragraph 15 appear to contain the contents of writings, such writings speak for themselves. To the extent any further response is required, Kirkwood answers the various allegations of Paragraph 15 as follows:**

- **Kirkwood admits that the Committee expressed a desire for the sculpture to be compatible with a water feature.**

- **Kirkwood admits that the Committee originally considered a sculpture that would be created in bronze.**

- **Kirkwood admits that Mason advised that creation of the sculpture in bronze was not compatible with a water feature.**

- **Any additional allegations contained in Paragraph 15 not explicitly admitted are denied.**

16.    Mason created a model for a work that was approved in May 2007 by the Committee. Copies of photographs of those models are attached hereto as Exhibits 18-19, and this reference incorporated herein. Mason then created the finished work, consisting of two sculptures in stainless steel and kiln-formed glass with an integrated water feature, titled "Before the Sun Speaks" (the "Work"). Copies of photographs of the Work are attached hereto as Exhibits 20-23, and by this reference incorporated herein. The two stainless steel sculpture components of the Work were installed at the Conference Center on October 26, 2008. A copy of a photograph of the installation of these components of the Work is attached hereto as Exhibit 24, and by this reference incorporated herein. The kiln-formed glass components were installed in January 2009.

**ANSWER:  Kirkwood answers the various allegations of Paragraph 16 as follows:**

- **Kirkwood admits that the Committee approved a model in 2007.**

- **Kirkwood admits that Mason finished two stainless steel and kiln-formed glass sculptures (to be mounted in a utilitarian concrete basin and compatible with a water feature) entitled "Before the Sun Speaks."**

- **Kirkwood admits that the metal sculptures were installed in the lobby or pre-event space at what was then known as the Conference Center for Continuing Education (KCCE), but is now known as the Hotel at Kirkwood Center, in October 2008.**

- **Kirkwood admits that the kiln-formed glass components were installed in 2009.**

- **Kirkwood denies for lack of information specifics regarding Plaintiff's process.**

- **Any additional allegations contained in Paragraph 16 not explicitly admitted are denied.**

17.     Three articles on the Work were published in the Cedar Rapids Gazette in 2009, written by that paper's art and culture critic of 27 years at that point, David Rasdal. In an article from March 13, 2009 entitled "Kirkwood sculpture brings nature home for artist who grew up in C.R.," Rasdal stated "Heavy sheets of stainless steel, 14 feet tall, twist down toward the water like wind-blown ribbons. Elliptical leaves of kiln-fired stained glass fool you into believing they are flowers blooming in spring. Water cascades from one steel cone to another, simulating the soothing sound of a waterfall. If any nearly 2-ton metal sculpture can make you feel the delicate touch of nature, 'Before the Sun Speaks' does." A copy of that article is attached hereto as Exhibit 25, and by this reference incorporated herein. In an article published March 13, 2009, "Art for Art's Sake—Bring Molly Back," Rasdal stated "I listened to the tranquil sounds of water flowing from her [Mason's] latest sculpture—a pair of magnificent in-tune-with-nature stainless steel creations that stand 14 and 14 A feet tall... It [the Work] is simply gorgeous and shows all the hard work, something like 2,500 hours, she [Mason] put into every detail because it was special for her to create art for her hometown... this Kirkwood building is a great place for Molly's sculpture." A copy of that article is attached hereto as Exhibit 26, and by this reference

incorporated herein. In an article published on November 2, 2009, "Ramlin': New York artist returns to her Iowa roots," Rasdal describes the "lights that magnificently illuminate the striations in the steel and the colors of the glass... 'I wanted to do large scale public work that's out there,' Molly says. 'That shows what I can do.'" Rasdal concludes, "'Before the Sun Speaks' at Kirkwood accomplishes that goal and, with this week's appearances, hopefully more." A copy of that article is attached hereto as Exhibit 27, and by this reference incorporated herein. The Work was formally unveiled and introduced on November 6, 2009, which Mason used as an opportunity to help "raise money for flood damaged art facilities, the UI Museum of Art, and the UI School of Art and Art History... and the new Ceramics Center in Cedar Rapids" due to the 2008 Iowa flood. *Id.* This event and the Work are also featured in Molly Mason, Sculptor, a documentary video made about the Work featuring Iowa City sculptor Shirley Wyrick interviewing Mason about the Work.

> **ANSWER:** **With respect to allegations of Paragraph 17 that appear to refer to the contents of writings, such writings speak for themselves. Kirkwood admits that the work was formally unveiled in 2009. Any additional allegations contained in Paragraph 17 not explicitly admitted are denied.**

18.     Many other media sources have featured pictures of the Work and described its significance. The Work is featured in a color photograph alongside two other works by Mason on page 112 of the internationally-distributed book on the prominent New York City gallery, SoHo20: *SoHo20 Gallery 1973-2013: Celebrating 40 Years of Supporting Women in the Arts* by Jenn Dierdorf and Francine LeClercq. A copy of that book inclusion is attached hereto as Exhibit 28, and by this reference incorporated herein. The Work is also featured online by The International Sculpture Center, the most prominent sculpture-focused organization in the world.

A copy of that online feature is attached hereto as Exhibit 29, and by this reference incorporated herein. It is also included in the Public Art Archive, a forty-year old organization developed by the Western States Arts Foundation. A copy of that listing is attached hereto as Exhibit 30, and by this reference incorporated herein.

**ANSWER: With respect to allegations of Paragraph 18 that appear to refer to the contents of writings, such writings speak for themselves. To the extent any further response is required, the allegations contained in Paragraph 18 are denied.**

19. Kirkwood promotes the Work on its website, on the "Art on Campus" page, at the top of the "Hotel Artwork Page," in numerous images on The Hotel website, as well as in countless images that Kirkwood features on its social media pages for The Hotel and Kirkwood on Facebook and Google Maps. Copies of these photographs are attached hereto as Exhibits 3 1 - 48, and by this reference incorporated herein. Additionally, there are well over 130 images of the Work posted by the general public on social media sites such as Instagram, with a selection of copies of these images attached hereto as Exhibits 49-58, and by this reference incorporated herein. Based on all of the above, the Work is both a work of visual art under VARA and a work of recognized stature under that statute.

**ANSWER: With respect to allegations of Paragraph 19 that appear to refer to the contents of writings, such writings speak for themselves. Additionally, the allegations of Paragraph 19 constitute legal conclusions to which no response is required. Insofar as any further response is required, Kirkwood denies the allegations of Paragraph 19.**

20. Mason viewed the creation of the Work as an opportunity to create a visually powerful, thought stimulating public work that could provide an iconic and delightful visual and

aural anchor for this site—one that would exert a strong aesthetic and cultural impact on generations of students, faculty, visitors, and staff to the Conference Center. These sculptural works integrated with the ever-changing patterns of the water movement and the delightful aural aspects of the Work have fostered an engaging space for thought and pleasure that comprises the major gathering space within the building's vast 4,100 square foot lobby. The Work, in its rising, positive energy and spiraling, powerful sense of growth, creates an evocation of transformation.

**ANSWER:  Kirkwood admits that the lobby in which the artwork is situated is a large space appropriate for gatherings and events. Kirkwood denies all allegations not explicitly admitted for lack of information.**

21.     Mason was selected by the Committee to create artwork for the Conference Center due to the power of her professional work and the fact that she had created works in many varied public venues in the United States and abroad since 1982. This Committee was comprised of Kirkwood's art professionals, those professional artists and art historians teaching in their Art Department and was headed by Bradley. They were Kirkwood's professional art experts, qualified to evaluate and thoughtfully select Mason's proposed artwork over a period of many months in 2006-7 after having first communicated an interest in acquiring artwork by Mason in 2000. They chose this complex Work integrating two sculptures and the water feature. By having the Committee select this public artwork, the Work was recognized as a significant work of visual art from its inception.

**ANSWER:   Kirkwood admits that the Committee included art teachers and artists. The remaining allegations of Paragraph 21 constitute legal conclusions to which no response is required. Insofar as an answer is required, Kirkwood denies any allegations of Paragraph 21 not explicitly admitted.**

<u>DESTRUCTION OF ARTWORK</u>

22.     For over a decade, the Work remained an outstanding and highly visible work of public art in Kirkwood's art collection. Mason was never contacted by Kirkwood about any issues, concerns, or problems with the Work after it was fully installed in January of 2009.

**<u>ANSWER:</u>  Kirkwood admits that the sculpture was fully installed in 2009 and currently remains in the Hotel at Kirkwood Center. Kirkwood admits that Kirkwood did not contact Mason regarding any issues, concerns, or problems with the sculpture after its instillation. Any allegations in Paragraph 22 not explicitly admitted are denied.**

23.     On or about June 25, 2020, Mason became aware that Kirkwood had taken actions to intentionally distort, mutilate, or modify the Work, with the result that the water feature component of the Work had been shut off and the jets and lights had been covered with a great deal of plant material and potting soil, and resulting decaying plant matter. The gradual process of Kirkwood's deliberate distortion, mutilation, or other modification of the Work is portrayed in copies of photographs attached hereto as Exhibits 59-64, and by this reference incorporated herein. The insertion of plant material began between March 25, 2018 (See, Exhibit 58), and April 1, 2018 (See, Exhibit 59), with the volume of plants being increased over time and the water feature eventually being shut off between May 20, 2018 (See, Exhibit 62) and August 29, 2018 (See, Exhibit 64). The Work has remained in this distorted, mutilated, or modified state from that time until at least February 20, 2021, as demonstrated by copies of photographs attached hereto as Exhibits 65-73, and by this reference incorporated herein.

**<u>ANSWER:</u>  Kirkwood responds to the various allegations of Paragraph 23 as follows:**

- **Kirkwood denies the date on which Mason became aware of any alleged alteration to the sculpture for lack of information.**

- **Kirkwood denies that it took any action intentionally or otherwise to distort, mutilate, or modify the sculpture.**

- **Kirkwood admits that use of the water feature was eventually discontinued.**

- **Kirkwood admits that plant material was eventually placed in the utilitarian concrete base of the sculpture, but clarifies that any such plant material was contained in independent pots or plant containers, and that the basin itself was never filled directly with plant material, soil, or decaying plant matter.**

- **Kirkwood alleges it took no steps with respect to the sculpture that are physically irreversible.**

- **Kirkwood denies that Mason's work is now or was at any time in any distorted, mutilated, or modified state.**

- **Any allegations contained in Paragraph 23 not explicitly admitted are denied.**

24.     On or about June 30, 2020, Mason called Dr. Lori Sundberg ("Sundberg"), who indicated that she did not know when the work had been modified, but that it had been in that state since at least July 31, 2018, when she started as the President of Kirkwood. Despite alleging unawareness of the modification of the Work, Sundberg also indicated in that conversation that she was aware of an "Engineer's Report" (the "Report") which allegedly indicated that certain bolts on the Work were rusting. Sundberg promised to send Mason a copy of the Report, as soon as she could locate a copy of it.

**ANSWER:  With respect to the allegations of paragraph 24, Kirkwood admits that, commencing mid-2020, Plaintiff complained to Kirkwood excessively, loudly and**

**even unprofessionally, including in direct conversation with Kirkwood's president. All allegations not specifically admitted are denied.**

25. Approximately two weeks later, in July 2020, Sundberg called Mason and advised her that she had consulted counsel, who had told her that she could not provide any documents to Mason. Sundberg refused to answer Mason during that conversation, when asked if the Report even existed. During this conversation, Mason volunteered to work with other professionals to repair the damage that had been done to the Work, stating that she would only request reimbursement for the costs incurred in achieving such repair work, but Sundberg refused the offer. Sundberg stated to Mason that Kirkwood could do anything it wanted with the Work, because it owned it.

**<u>ANSWER</u>: With respect to the allegations of paragraph 25, Kirkwood admits that, commencing mid-2020, Plaintiff complained to Kirkwood excessively, loudly and even unprofessionally, including in direct conversation with Kirkwood's president. Kirkwood further admits it consulted legal counsel. All allegations not specifically admitted are denied.**

26. During that call, Sundberg advised Mason that she had three (3) options with respect to the Work. First, Kirkwood could remove the dedication plaque on the Work that identified Mason as the artist. Second, Mason could come to Kirkwood and remove the Work, at her own expense, within a ninety (90) day period. Third, Kirkwood could maintain the Work, as modified, without the water feature and instead, with planters and soil. Sundberg also claimed that OPN Architects ("OPN"), Miron Construction ("Miron"), and the person she referred to as "the installer," which referred to rigger Larry Weeks ("Weeks"), had rescinded their rights as alleged "co-authors" of the Work, under VARA.

**ANSWER: With respect to the allegations of paragraph 26, Kirkwood admits that, commencing mid-2020, Plaintiff complained to Kirkwood excessively, loudly and even unprofessionally, including in direct conversation with Kirkwood's president. Kirkwood further admits it offered to Plaintiff potential steps that might resolve Plaintiff's complaints and obviate the necessity for ongoing complaints. All allegations not specifically admitted are denied.**

27.     On or about August 27, 2020, Mason called the main phone number listed for Kirkwood and asked to be connected to its business office. Mason placed that call to request a copy of any agreement by and between her and Kirkwood, with respect to the Work. She left a voicemail on that office's answering machine with her name, telephone number, and a summary of the information she was seeking.

**ANSWER: With respect to the allegations of paragraph 27, Kirkwood admits it received a voice message from Plaintiff, to which it responded. All allegations not specifically admitted are denied.**

28.     Within an hour of leaving that voicemail, James Choate ("Choate") of Kirkwood called Mason and left her a voicemail. Choate advised her that Kirkwood did "...not have available for you a contract that we can send to you." He recommended that she call Sundberg and that he was aware that she had two (2) solutions for Mason with respect to the Work.

**ANSWER: With respect to the allegations of paragraph 28, Kirkwood admits it received a voice message from Plaintiff, to which it responded that it could not send a contract to Plaintiff because the contract could not be found. Kirkwood further admits that it has consistently offered alternatives to Plaintiff for the purpose of**

**resolving Plaintiff's complaints and concerns. All allegations not specifically admitted are denied.**

29. On August 29, 2020, Mason e-mailed Conrad, who is currently employed at the University of Iowa, as the Administrator, Division of Performing Arts, a position she has held for 14 years, since she left Kirkwood on June 30, 2006. A copy of that e-mail is attached hereto as Exhibit 74, and by this reference incorporated herein. Conrad replied to Mason by e-mail that same day, stating "Oh dear! I have not been in that space in a long time. This is really disturbing. Arbe Baries [sic] is still in charge of the college's art collection, I believe. I'm copying him to see if he can help.. .Let me know what you find out and if there's any background info I can provide to assist," and copied Arbe Bareis, the Fine and Performing Arts Specialist and Curator at Kirkwood, to see if he could assist with the matter. A copy of that e-mail is attached hereto as Exhibit 75, and by this reference incorporated herein.

**ANSWER: With respect to Paragraph 29, Kirkwood denies for lack of information allegations concerning employment of Mary Kayt Conrad. The remaining allegations of Paragraph 29 appear to relate to the contents of writings that speak for themselves. To the extent a further response is required, all remaining allegations are denied.**

30. Just over one hour later, Sundberg e-mailed Mason and requested that she "Cease and Desist" from contacting anyone at Kirkwood regarding the Work. A copy of that e-mail is attached hereto as Exhibit 76 and by this reference incorporated herein.

**ANSWER: The allegations of Paragraph 30 appear to relate to the contents of a writing that speaks for itself.**

31.     Sundberg presented two (2) options to Mason, indicating that if she was "forced," she would issue a ninety (90) day removal of the Work, at Mason's expense. According to Sundberg, if the Work was not so removed, Kirkwood would remove it and, if Mason wanted the Work, she would need to reimburse Kirkwood for the removal. Sundberg's second option was for Mason to tell her what plants she wanted in the Work and, if they were reasonably priced, Kirkwood would "comply."

**ANSWER:     The allegations of Paragraph 31 appear to relate to the contents of a writing that speaks for itself.**

32.     Sundberg then admonished Mason about her contacts to Choate and Conrad, stating "[t]he only person authorized to settle this dispute is me." Conrad does not now, nor has she ever worked for Sundberg; Mason was free to contact her regarding this, or any other matter. In fact, Mason had never contacted Choate, but had received a phone call from him on or about August 27, 2020.

**ANSWER:     The allegations of Paragraph 32 appear to relate to the contents of a writing that speaks for itself. To the extent a further response is required, Kirkwood denies the remaining allegations for lack of information.**

33.     Mason retained counsel in this matter and authorized communication on her behalf with Kirkwood.

**ANSWER:  With respect to the allegations of Paragraph 33, Kirkwood admits that Mason retained counsel related to this litigation and that Kirkwood's counsel has communicated with Mason's counsel regarding this matter.**

34.     On or about November 20, 2020, counsel for Kirkwood corresponded with counsel for Mason by letter and claimed therein that A) the Work never functioned properly in

that it "sprayed water on the floor" and "made too much noise for anyone to have a conversation in the vicinity of the Work", B) it was rusting, C) the water feature had become malodorous, D) the modifications done to the Work were not violative of VARA, E) the Work is not covered by VARA, F) there were co-authors who had waived their VARA rights, and G) Kirkwood was prepared to issue a 90-day removal notice. A copy of that letter is attached hereto as Exhibit 77 and by this reference incorporated herein.

> **ANSWER:**   **The allegations of Paragraph 34 appear to relate to the contents of a writing that speaks for itself.**

35.     On or about December 23, 2020, counsel for Mason received from counsel for Kirkwood a 90-day removal notice. A copy of that notice is attached hereto as Exhibit 78 and by this reference incorporated herein.

> **ANSWER:**   **The allegations of Paragraph 35 appear to relate to the contents of a writing that speaks for itself.**

36.     On or about January 22, 2001, counsel for Mason corresponded with counsel for Kirkwood in response to its various assertions. A copy of that letter is attached hereto as Exhibit 79 and by this reference incorporated herein.

> **ANSWER:**   **The allegations of Paragraph 36 appear to relate to the contents of a writing that speaks for itself.**

37.     As set forth above, Mason had not been contacted by anyone at Kirkwood since 2009 regarding the Work. When it was installed, all elements of the water feature component of the Work (the "Water Feature"), and the Work as a whole, operated properly. If there had been any malfunctions of the Water Feature, or other issues with the Work, Kirkwood could and should have contacted Mason.

**ANSWER:** **Kirkwood admits that Kirkwood did not contact Plaintiff about the work following the completion of its installation. Kirkwood denies that all elements of the water feature component of the work operated properly at the time of installation or consistently thereafter. With respect to the allegations of Paragraph 37, Kirkwood denies that it had any affirmative obligation to contact Mason about issues with the water feature.**

38.     In addition, there are well over one hundred images of the Work online, including from Kirkwood's own website and social media accounts from the 2008 installation up through May of 2018, that show the Water Feature operating perfectly. See, Exhibits 31-58.

**ANSWER:** **The allegations of Paragraph 38 appear to relate to the contents of writings or documents that speak for themselves.**

39.     These images show up to several hundred persons attending public conferences, lectures, and private formal events such as weddings. Lectures are frequently shown with speakers positioned very close to the Work, including former Governor Terry Branstad addressing a packed seated crowd at a "Condition of the State" event (See, Exhibit 50). Many images also show visitors to the facility standing near the Work, engaged in conversation, and many more show sizable groups of nicely dressed people standing near or sitting on the edge of the Water Feature.

**ANSWER:** **The allegations of Paragraph 39 appear to relate to the contents of writings or documents that speak for themselves.**

40.     If the Work sprayed water on the floor, visitors would not have had their photos taken in proximity to it or be seated and standing on the low wall around the Water Feature. If the Work was so loud as to prohibit conversations in its vicinity, these major public events would

not have been held near it, since the Work's 2008 installation. The Work is clearly the major focal point of the 4,100 square foot Conference Center, as it was designed to be, and major events and weddings continue to be held directly in front of the Work as recently as February 20, 2021. See, Exhibit 73.

**ANSWER: With respect to the allegations of Paragraph 40, Kirkwood admits that events continue to be held in the lobby of the Hotel at Kirkwood Center. All allegations contained in Paragraph 40 not explicitly admitted are denied.**

41. There is no evidence of any rust in any of the images of the Work. Moreover, contrary to Kirkwood's assertion, the sculptures are not "bolted" together. All of the metal in the sculptures is top grade, marine stainless-steel alloy 316, and all of the sculptures are welded together with stainless steel welding rod.

**ANSWER: The allegations of Paragraph 41 appear to relate to the contents of writings that speak for themselves. To the extent any further response is required, Kirkwood denies the allegations of Paragraph 41 for lack of information.**

42. As negotiated by the parties and in the successful proposal documents, as sent to Bradley, the then-Physical Plant Director, and OPN Architects, Mason specified that only stainless-steel bolts (12" long by 5/8" thick) and other stainless hardware for acorn bolts and washers were to be used by the College or its agents to secure the two sculptures to their concrete bases (See, Exhibit 16, page 2, Paragraph 5, and page 4). The installation of the Work was a written obligation of Kirkwood and its agents—OPN Architects and Miron Construction, as to be administered by the then-Director of the Physical Plant and this obligation was signed off on by both Bradley and the then-Director of the Physical Plant. If any of these parties substituted the

mandated stainless-steel bolts and other hardware with mild steel or other materials, then they caused the rust, if any.

**ANSWER:** **The allegations of Paragraph 42 appear to relate to the contents of a writing that speaks for itself. Additionally, the allegations of Paragraph 42 constitute legal conclusions to which no response is required. Insofar as further response is required, Kirkwood denies the allegations of Paragraph 42.**

43.     If rust did appear anywhere in the Work, Kirkwood should have contacted Mason to address the issue at that time. The Public Art Network of the Americans for the Arts, the only national professional network in the United States dedicated to advancing public art programs and projects through advocacy, policy, and information resources to further art and design in this country, has created a substantial document, "Statement of Purpose: Best Practices for Public Art Projects," which emphasizes under Point 28 that "If an Artwork is damaged, Administrators should make a good faith effort to consult the artist about repairs," and under Point 27, "Commissioning bodies and/or ultimate owners should have collection management policies in place and should notify Artists of these policies." These are the professional standards across the great range of public art programs in the United States. A copy of that document is attached hereto as Exhibit 80 and by this reference incorporated herein.

**ANSWER:** **The allegations of Paragraph 43 appear to relate to the contents of a writing that speaks for itself. To the extent an additional response is required, Kirkwood denies the allegations of Paragraph 43 for lack of information.**

44.     With respect to the water being malodorous, Kirkwood, and only Kirkwood, was responsible for the cleaning of the water once it was installed. Kirkwood was responsible for all regular maintenance issues once the Work was installed. Regular, correct maintenance is always

required on water features, and on anything with moving parts. At no time did Kirkwood contact Mason to address any issues with the Work.

**ANSWER:** **The allegations of Paragraph 44 appear to relate to the contents of a writing that speaks for itself. To the extent an additional response is required, Kirkwood denies the allegations of Paragraph 44 for lack of information.**

45. Mason did an enormous amount of documented research on the water quality in the Conference Center specifically and provided written documentation from nationally prominent water purification experts, and Cedar Rapids public water supply experts. She provided a Copper Ion purification system installed directly in the Water Feature and a filter pump with all necessary manuals to address schedules of all maintenance, including filter replacement and water quality issues. In fact, there are 17 manuals for maintenance totaling over 150 pages that were provided to Kirkwood by Mason at the installation of the Work.

**ANSWER:** **Kirkwood denies the allegations of Paragraph 45 for lack of information.**

46. In addition, on some date between March 25, 2018 and April 1, 2018, Kirkwood began adding large numbers of deciduous ornamental plants and soil directly into the Work, inside the pool, upon the sculpture's bases, and directly into the large lower "cone" form of the plumbed sculpture. These actions on Kirkwood's part constitute intentional and willful distortion, mutilation, manipulation, or other modification of the Work, which is prejudicial to Mason's honor or reputation. This all began with the Water Feature running, as documented extensively in Exhibits 59-62.

**ANSWER:** **With respect to the allegations of Paragraph 46, Kirkwood admits that it ultimately discontinued operation of the water feature and added potted plants to**

**the utilitarian basin containing the sculpture. The additional allegations of Paragraph 46 constitute legal conclusions to which no response is required. To the extent a further response is required, all allegations not explicitly admitted are denied.**

47.     The Water Feature continued to run with plants inserted into it starting on or before April 1, 2018 through at least May 20, 2018, and possibly all the way until August 28, 2018, causing months of damage. This introduced decaying plant material and soil into the water supply, which created bacterial contamination of the water supply, and clogged the Water Feature's four pumps, including the filter pump; the 18 computerized spray jet heads, and the twelve lighting elements set in the pool. Additionally, this abrasive soil running through the pool and all its plumbing would cause major damage to the operating systems for every component of the Water Feature. Malodorous water was an entirely foreseeable and wholly avoidable outcome of that decision, and one completely attributable to Kirkwood, not Mason.

**ANSWER:   With respect to the allegations of Paragraph 47, Kirkwood denies that the water feature continued running at any time following the insertion of potted plant material into the utilitarian basin. Kirkwood admits it ultimately discontinued operation of the water feature but denies that such action is in any way irreversible or otherwise caused damage to the sculpture or utilitarian basin. All allegations not explicitly admitted are denied.**

48.     By August 29, 2018, the pumps had been turned off, and the entire pool was filled with plants and even trees, many of them appearing to be 7 feet in height or larger. The "cone" interiors, painted turquoise blue by Mason with top-of-the-line Dupont Marine Grade paint, could likely have been badly damaged by Kirkwood's act of filling this large cone shape with

dirt and shedding plants, in addition to preventing the water from flowing through all four cones as it was designed to do, further damaging the filter and pumps. Here again, such actions constitute gross intentional negligence, distortion, mutilation, manipulation, or other modification of the Work, which is prejudicial to Mason's honor or reputation.

**ANSWER:** **With respect to the allegations of Paragraph 48, Kirkwood admits it ultimately discontinued operation of the water feature and placed potted plants in the in the utilitarian concrete basin in which the sculpture is mounted. Kirkwood denies in any way that such actions are in any way irreversible. All allegations not explicitly admitted are denied.**

49. Kirkwood also referred to what it alleged to be utilitarian aspects of the Work, "...as it is a fountain..." and implied that it is prone to being found to be applied art, and thus not subject to VARA. In fact, VARA applies only to "works of visual art" as defined by Section 101 of the Copyright Act and includes paintings, drawings, prints, or sculptures, which exist in a single copy or in certain limited editions. Under that definition, the Work is clearly a work of visual art and subject to VARA. In fact, Kirkwood describes the Work on its own web site, where it is referred to as "art" and "artwork." See under "Art on Campus" and "Hotel Artwork": https://www.kirkwood.edu/about-us/faculty-leadership/academic-departments/arts-and-humanities/index (Exhibits 31 and 32).

**ANSWER:** **The allegations of Paragraph 49 appear to relate to the contents of writings that speak for themselves. Additionally, the allegations of Paragraph 49 constitute legal conclusions to which no response is required. To the extent an additional response is required, Kirkwood denies the allegations of Paragraph 49.**

50.    The Committee that selected the Work was composed of the professional artists teaching at Kirkwood and the two Arts and Humanities Deans. This committee explicitly desired an artwork consisting of sculptural works integrated with a water feature for the Conference Center, having been impressed by Mason's previous works with water features. Mason's work was unanimously chosen by the Committee. Kirkwood's disabling of the Water Feature component destroyed the complete Work— the two sculptures integrated with the Water Feature— that had been approved by its own Committee in 2007.

**ANSWER:   Kirkwood admits that the Committee included art teachers and artists. Kirkwood admits that the Committee considered a sculptural work that would be compatible with a water feature. Kirkwood admits that Mason's work was selected by the Committee. All allegations contained in Paragraph 50 not explicitly admitted are denied.**

51.    In the last 25 years in this country, literally hundreds of sculptural works with integrated water features have been created by artists for the public art boards that run the public art programs; the inclusion of the Water Feature integrated with sculpture to comprise the total Work in no way invalidates this Work from being protected by VARA. The integration of water with Mason's sculpture is wholly aesthetic in its nature, not utilitarian—this is not a drinking fountain or a swimming pool. The variable water flow patterns in the Water Feature, and through the plumbed sculpture, were designed by Mason solely for aesthetic enjoyment, both visual and aural, and this Work clearly operated as such from 2008 until April 2018, when Kirkwood added the decorative plants into the still-running Water Feature, and then, several months later, by August 29, 2018, shut off the water component of the Work.

**ANSWER:** **The allegations of Paragraph 51 constitute legal conclusions to which no response is required. To the extent a further response is required, Kirkwood denies the allegations of Paragraph 51 for lack of information.**

52.     Kirkwood also claimed that because architects and contractors were involved in the installation of aspects of the Work, they became co-authors of it, and therefore are entitled to the same protections under VARA as Mason. If a painter employs a frame builder to construct a frame for his painting, the frame builder does not have any rights to the painting created by the painter. If a ceramicist buys clay from a distributor and creates ceramic art with it, the distributor has no intellectual property rights in the final work. The fact that OPN and Miron assisted in the installation of the Work does not confer upon them the status of a co-author or co-artist. There is one author of the Work, and that is Mason.

**ANSWER:** **The allegations of Paragraph 52 constitute legal conclusions to which no response is required. To the extent a further response is required, Kirkwood denies the allegations of Paragraph 52.**

53.     Counsel for Mason indicated that if Kirkwood simply took a few small steps, the matter could be resolved. First, it must remove every plant from the Work and agree to not replace them in it. Second, it must inspect, repair and/or replace the pumps that control the Water Feature, the water jet components, the computerized variable water movement system, the lighting in the pool, and any damage to painted surfaces, so that the Work is fully restored. Since her contact with Sundberg in July of 2020, and repeated in her counsel's contact on January 22, 2021, Mason has offered to contribute her expertise to consult on any and all aspects of this restoration. A copy of that correspondence with the aforementioned offer on page 5 is attached hereto as Exhibit 79, and by this reference incorporated herein.

**ANSWER:** **The allegations of Paragraph 53 appear to relate to the contents of writings that speak for themselves.**

54.     On or about February 3, 2021, counsel for Kirkwood responded by letter that Kirkwood would not take those steps and would proceed with their previous letter's plan to remove the Work after the expiration of the 90-day notice, if Mason did not remove the Work. A copy of that letter is attached hereto as Exhibit 81 and by this reference incorporated herein.

**ANSWER:** **The allegations of Paragraph 54 appear to relate to the contents of a writing that speaks for itself.**

CAUSE OF ACTION
VIOLATION OF THE VISUAL ARTISTS RIGHTS ACT AND COPYRIGHT
INFRINGEMENT

55.     VARA was enacted by Congress in 1990 to provide moral rights protections to artists. It provides in part that "the author of a work of visual art-(l) shall have the right--(A) to claim authorship of that work and (B) prevent the use of his or her name as the author of any work of visual art which he or she did not create; (2) shall have the right to prevent use of his or her name as the author of a work of visual art in the event of a distortion, mutilation, or other modification of the work which would be prejudicial to his or her honor or reputation and (3) subject to the limitations set forth in 113(d), shall have the right— (A) to prevent any intentional distortion, mutilation, or other modification of that work which would be prejudicial to his or her honor or reputation, and any intentional distortion, mutilation, or modification of that work is a violation of that right, and (B) to prevent any destruction of a work of recognized stature and any intentional or grossly negligent destruction of that work is a violation of that right." 17 U.S.C. Section 106(a)(3)(A)-(B).

**ANSWER:** **The allegations of Paragraph 55 constitute legal conclusions to which no response is required.**

56.     Section 101 of the Copyright Act defines a "work of visual art" as a "...painting, drawing, prints, or sculpture, existing in a single copy..." Section 101. Plaintiffs Work is a unique and original sculpture that exists in a single copy, and clearly satisfies the definition of a "work of visual art" under VARA.

**ANSWER:** **The allegations of Paragraph 56 constitute legal conclusions to which no response is required. To the extent any further response is required, the allegations of Paragraph 56 are denied.**

57.     Mason is the sole author of the Work and has the exclusive right to safeguard the integrity of it by preventing any intentional distortion, mutilation, modification or destruction of the Work that would be prejudicial to her honor or reputation. She has never consented to the distortion, mutilation, destruction, or other modification of the Work, nor has she waived het rights under VARA. 17 U.S.C. Section 106(a)(3)(A).

**ANSWER:** **Kirkwood denies that Mason is the sole author of the work. Kirkwood admits that Mason has not personally executed a written wavier of her rights under VARA. The additional allegations of Paragraph 57 constitute legal conclusions to which no response is required. To the extent any further response is required, any allegations contained in Paragraph 57 not explicitly admitted are denied.**

58.     The Work is a sculpture comprised of stainless steel, kiln-formed glass, and Water Feature components, and only one version of it exists. It was created after the effective date of VARA and as Mason is still alive, its protection remains in effect (VARA protections cease upon the death of the artist). The Work has been featured prominently on Kirkwood's and The Hotel's

web sites; is displayed frequently on social media, both Kirkwood's and accounts of visitors to the facility; has received considerable media attention that praises it as a significant contribution to the facility and community; and is a work of recognized stature. 17 U.S.C. Section 106(a)(3)(B).

>**ANSWER:** **Kirkwood admits that the sculpture is comprised of stainless steel, kiln-formed glass, is mounted on a utilitarian concrete basin and is (and remains) compatible with a water feature. Kirkwood admits that only one version of the sculpture exists. Kirkwood admits that the sculpture was created after the effective date of VARA. Kirkwood admits that Mason is alive. The remaining allegations of Paragraph 58 constitute legal conclusions to which no response is required. To the extent any further response is required, all allegations not explicitly admitted are denied.**

59.    Kirkwood's reckless and willful failure to maintain the Work is an intentional or grossly negligent destruction of a work of recognized stature, and has caused the distortion, mutilation, or other modification of the Work that is prejudicial to Mason's honor or reputation in violation of her rights under VARA. 17 U.S.C. Section 106(a)(3)(A)-(B).

>**ANSWER:** **Kirkwood denies the allegations of Paragraph 59.**

60.    Kirkwood's reckless and willful insertion of plants to the Work is an intentional or grossly negligent destruction of a work of recognized stature, and has caused the distortion, mutilation, or other modification of the Work that is prejudicial to Mason's honor or reputation in violation of her rights under VARA. 17 U.S.C. Section 106(a)(3)(A)-(B).

>**ANSWER:** **Kirkwood denies the allegations of Paragraph 60.**

61.     Kirkwood cannot proceed with the complete removal of the Work, or force Mason to remove the Work, as it cannot "...be removed from the building without the destruction, distortion, mutilation, or other modification of the work as described in section 106A(a)(3)..." 17 U.S.C. Section 1 13(d)(2).

**ANSWER:     Kirkwood denies the allegations of Paragraph 61.**

62.     If Kirkwood proceeds with removal of the Work, it will further violate Mason's rights under VARA unless she either consented to the installation of the Work into the building before VARA's effective date of June 1, 1991 or the right has been waived through the execution of a written waiver that is signed by both Mason and Kirkwood. That waiver must specifically identify the Work and uses of that Work to which the waiver applies and must specify "...that installation of the work may subject the work to destruction, distortion, mutilation, or other modification, by reason of its removal..." 17 U.S. Code Section 1 13(d)(1)(B).

**ANSWER:     Kirkwood denies the allegations of Paragraph 62.**

63.     Mason did not consent to the installation of the Work before June 1, 1991 and no written waiver was executed by her and Kirkwood. Accordingly, regardless of the 90-day notice Kirkwood cannot remove the Work without Mason's consent, and if it proceeds with that removal, it will be a further violation of Mason's rights under VARA.

**ANSWER:     Kirkwood admits that all factual circumstances regarding this litigation occurred on or after June 1, 1991. Kirkwood admits that Mason has not personally executed a written wavier. All other allegations contained in Paragraph 63 not explicitly admitted are denied.**

64.     Mason's Work continues to be promoted to the public in its original form through print and online sources and the Work is inextricably associated with Mason.

**ANSWER:** **Kirkwood denies the allegations of Paragraph 64 for lack of information.**

65.     As the Work is a highly visible public work of art that has been and continues to be attributed to Mason in the media—the International Sculpture Center and the Public Art Archive, and in many sources across the internet and in the public art world-the destruction, mutilation, and manipulation of the Work are prejudicial to the honor and reputation of Mason because they A) ruin the aesthetics of the Work because the Water Feature is no longer incorporated into the sculptures; B) destroy its symbolic significance by preventing people from observing and appreciating the Work as it was created for the Conference Center space by Mason—and continues to be shown in publications and photographic records of the work; C) damages the honor and purpose of Mason's Work; and D) can reasonably be misconstrued to have been caused or permitted to occur by Mason.

**ANSWER:** **Kirkwood denies the allegations of Paragraph 65.**

66.     Such willful, intentional, and grossly negligent actions and/or omissions by Kirkwood have caused and continue to cause Mason substantial injury, loss, and damages that are cognizable at law and equity.

**ANSWER:** **Kirkwood denies the allegations of Paragraph 66.**

67.     VARA clearly applies to Mason's Work. It is an artwork comprised of two sculptures integrated with a water feature that was created by her after the effective date of VARA. Mason has not waived her rights under VARA (or any other statute) with respect to the Work, and she is its sole author. While other individuals may have been hired to assist with minor, subordinate aspects of the production of the Work, there is only one name associated with it. There is only one name that appears in articles about the Work. There is only one name that

appears in book references to the Work. There is only one name on the plaque that is affixed to the Work and has been since 2008. That name is Molly Mason.

> **ANSWER:** **Kirkwood admits that the sculpture is comprised of two structures, is mounted in a utilitarian concrete basin and is compatible with a water feature. Kirkwood admits that the sculpture was created after the effective date of VARA. Kirkwood admits that Mason has not personally executed a written waiver of her rights under VARA. The additional allegations of Paragraph 67 constitute legal conclusions to which no response is required. To the extent any response is required, all allegations not explicitly admitted are denied.**

## ADDITIONAL DEFENSES

1. For additional defense, Plaintiff fails to state a claim upon which relief can be granted.

2. For additional defense, Mason's work was made for hire and is therefore excluded from VARA protection. *See* 17 U.S.C. § 101.

3. For additional defense, Mason's work constitutes applied art and therefore is excluded from VARA protection. *See* 17 U.S.C. § 106A; 17 U.S.C. § 113(d).

4. For additional defense, Mason is a joint creator of the work and VARA rights related to the work have been waived by a co-creator. *See* 17 U.S.C. 106A.

5. For additional defense, Mason's work does not constitute a work of recognized stature. *See* 17 U.S.C. 106A.

6. For additional defense, Mason's work does not encompass the utilitarian concrete basin in which the sculpture is mounted or the water feature itself, and thus these components are not subject to Mason's VARA claim.

7. For additional defense, application of VARA as Mason urges would unconstitutionally deprive Kirkwood of its property rights in violation of Amendment 5, U.S. Constitution.

8. For additional defense, all physical actions of Kirkwood with respect to the sculpture (including the utilitarian concrete basin in which the sculpture is mounted and the water feature) are simply and fully and completely reversible.

9. For additional defense, Kirkwood cannot constitutionally be required to exhibit Mason's work in its current location (or the utilitarian concrete basin in which it is mounted or the water feature) in perpetuity.

10. For additional defense, Kirkwood has offered to Mason return of the sculpture (with capability to be mounted in a utilitarian concrete basin and with a water feature) to Mason's full ownership and control for exhibition as she chooses on property other than that owned by Kirkwood.

11. For additional defense, Mason has not suffered any prejudice or harm to her reputation as a result of any alleged modification of the sculpture.

*/s/ Mark L. Zaiger*
MARK L. ZAIGER        AT0008655
for
SHUTTLEWORTH & INGERSOLL, P.L.C.
500 US Bank Bldg., P.O. Box 2107
Cedar Rapids, IA 52406
TELEPHONE:      (319) 365-9461
FAX:      (319) 365-8443
EMAIL:      mlz@shuttleworthlaw.com

ATTORNEYS FOR DEFENDANT
KIRKWOOD COMMUNITY COLLEGE

COPY TO:

David J. Bright
Pugh Hagan Prahm, PLC
425 E. Oakdale Blvd., Suite 201
Coralville, IA  52241
dbright@pughhagan.com

ATTORNEY FOR PLAINTIFF
MOLLY MASON

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of this document was served upon counsel of record for each party to the action in compliance with FRCP 5 on May 24, 2021 by:

[x] Electronically via ECF for ECF registrants
[ ] U.S. Mail _____
[ ] Fax _____
[ ] Fed Ex _____
[ ] Hand Delivered _____
[ ] other _____

_____/s/  Heather Bertch_____